**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **STELLA JOHNSON, ET AL.**<br><br>**v.**<br><br>**MARATHON PETROLEUM CORPORATION, ET AL.**<br><br>**** This pleading relates to**<br><br>***Rachel Duhe, et al. v. Marathon Petroleum Company, et al.***<br><br>**Case No. 2:23-cv-6096**** | **Civil Action No.: 2:23-cv-4573**<br>**C/W 2:23-cv-6096**<br>**C/W 2:23-cv-6312**<br><br>**Section "P" (1)**<br><br>**Judge Darrel James Papillion**<br><br>**Magistrate Judge Janis Van Meerveld** |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MARATHON PETROLEUM COMPANY LP'S MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Plaintiffs—Rachel Duhe and Kimeyan Alexander ("Original Class Reps"), and Mary Hampton, Melinda James, and Wayne James ("Amended Class Reps," and together with Original Class Reps, "Plaintiffs"), each individually and on behalf of a class of all those similarly situated—by and through undersigned counsel, respectfully submit this memorandum in opposition to the Motion to Dismiss Plaintiffs' Amended Class Action Complaint filed by Defendant, Marathon Petroleum Company LP ("Marathon").

## INTRODUCTION

This case arises out of a toxic fire at the Marathon Refinery in Garyville, Louisiana that, over the course of several days, emitted a plume of hazardous chemicals into the surrounding communities so large that it was detectable from space. The Refinery Fire is representative of Marathon's ongoing unwillingness to implement necessary remedial measures and demonstrates a pattern and practice of prioritizing profits over the well-being of its workers and the surrounding communities.

Marathon's disregard for the Louisianans who live, work, and play near the Garyville Refinery looms large in its Motion to Dismiss. Therein, Marathon boldly claims that numerous residents and business owners affected by the Refinery Fire are entitled to no relief because they "slept on their rights."[1] Plaintiffs did not "sleep on their rights"; instead, they were prevented from seeking due relief because of misrepresentations and concealments by Marathon. Indeed, Plaintiffs' Amended Complaint details the ways Marathon hid—and continues to hide—information about the Refinery Fire from the surrounding communities, both during and after the incident.

Plaintiffs' Original Petition utilized a metric for affected individuals and businesses that was at least partially informed by Marathon's incomplete reports of, and inadequate response to, the Refinery Fire. Specifically, by deciding or otherwise informing the bounds of the two-mile "Mandatory Evacuation Zone," characterizing the zone as merely "precautionary," and expressly assuring Plaintiffs that there were no "offsite impacts," Marathon successfully duped Plaintiffs and class counsel alike into believing that the Mandatory Evacuation Zone was an accurate and adequate way to objectively define the scope of the Refinery Fire's impacts. Crucially, while the geographic bounds of the originally proposed class were defined by the Mandatory Evacuation Zone,[2] the claims brought and parties represented were always plainly intended to encompass the impacts of the Refinery fire and emissions, not merely the impacts of the mandatory evacuation itself. However, previously concealed information that only recently came to light makes clear that this boundary was inaccurate. Marathon undoubtedly knew the Mandatory Evacuation Zone did

---

[1] R. Doc. 43-1, at 1.

[2] Plaintiffs' Original Petition proposed a class definition as follows: "All persons who owned property, and/or operated a business, and/or worked or resided within the two-mile Mandatory Evacuation Zone and who have been harmed by Marathon's conduct as alleged herein at any time from August 25, 2023, through the present." *Duhe*, R. Doc. 1-1, at ¶ 24.

not encompass the full class of individuals that Plaintiffs' Original Petition described and was on notice that it might have to defend against a broader claim. Meanwhile, Plaintiffs could not have known that they might be able to bring a broader claim—and therefore could not have reasonably acted on their rights—until new evidence of the full scope and severity of the Refinery Fire was first made publicly available in September 2024.

For these reasons and those discussed more fully herein, Plaintiffs' Amended Complaint was timely filed under the doctrine of *contra non valentem* and further relates back to the Original Petition such that Marathon's Motion to Dismiss should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 25, 2023, a chemical release and fire occurred at Marathon's Garyville Refinery, producing the second largest accidental release of flammable chemicals since the EPA began monitoring such events in 1994. R. Doc. 39, at ¶ 14. The Refinery Fire ignited after a storage tank containing at least one million gallons of the highly flammable and hazardous substance known as naphtha leaked for thirteen hours into a shared containment levee with live electrical wiring. *Id.* ¶¶ 15–19. By approximately 9:00 a.m. that morning, the uncontained flames from the naphtha fire led to the combustion of a second storage tank containing a staggering 1.68 million gallons of diesel, releasing a plume so large and distinct that it was detectable from space. *Id.* ¶ 21. As panic spread throughout the surrounding communities, emergency response officials assured concerned residents that all was under control. *Id.* ¶ 22. Little did the surrounding communities know that local officials had ceded partial control in the response efforts to Marathon, which had all the expertise and information about what was unfolding. *Id.*

By 10:30 a.m.—with Marathon already guiding emergency response efforts—a two-mile Mandatory Evacuation Zone surrounding the Garyville Refinery was finally announced. *Id.* ¶ 23.

Although the Mandatory Evacuation only lasted until 2:00 p.m. on August 25, the Refinery Fire continued for days with occasional big flare-ups that were beyond Marathon's capacity to contain and necessitated additional fire repression resources from surrounding oil refineries and fire departments. *Id.* ¶¶ 23–25. Fifteen hours after authorities—on the basis of information provided by Marathon—told residents it was safe to return home, a third storage tank holding nearly 420,000 gallons of highly flammable hydrocarbons caught fire, leading to a larger blaze and uncontrolled burn. *Id.* ¶ 26. Ultimately, efforts to control the Refinery Fire lasted at least three days after the naphtha pool under the first tank initially combusted. *Id.* ¶ 27.

Residents in the Area of Impact,[3] including Plaintiffs, experienced negative consequences from the hazardous emissions released by the Refinery Fire, reporting symptoms of nausea, dizziness, and headaches. The mandatory evacuation caused widespread panic throughout the Area of Impact and surrounding areas, causing residents to flee the comfort of their homes. *Id.* ¶¶ 28–29. On August 29, 2023—just four days after the first storage tank ignited—Plaintiffs filed their Original Petition in the 40th Judicial District Court for the Parish of St. John the Baptist asserting claims of negligence and other tortious conduct by Marathon on behalf of a putative class. *Duhe*, R. Doc. 1-1. The Original Petition sought relief for injuries suffered due to the Refinery Fire and emissions and the resulting two-mile Mandatory Evacuation Zone. *Id.* ¶¶ 26–55. In an effort to precisely and objectively define the putative class, and believing on the basis of information provided by Marathon and government entities that the Mandatory Evacuation Zone was

[3] Plaintiffs' Amended Complaint defines the Area of Impact as "on the east bank of the Mississippi River, north to US 61, south to Mississippi River, west to LA 3213, east to East 22nd Street; and on the west bank of the Mississippi River, north to Mississippi River, south to LA 3127, west to LA 3213, and east to Highway 640[.]" R. Doc. 39, at ¶ 55.

consistent with the potential scope of impacts, Original Class Reps and class counsel utilized the geographic boundary of the Mandatory Evacuation Zone for both sets of claims. *Id.*

To be sure, the Refinery Fire is not an isolated event, but is instead illustrative of Marathon's larger pattern and practice of prioritizing profits over the well-being of its workers and surrounding communities. R. Doc. 39, at ¶ 50. Indeed, Marathon is no stranger to emergency incidents occurring at the Refinery—there were more than a dozen reported accidents at the Refinery in 2022 alone. *Id.* ¶¶ 38–40. Yet, in response to these incidents, Marathon pushed off corrective measures and failed to follow regulations, industry standards, and its own recommendations. *Id.* ¶¶ 44–50. Marathon and the Refinery Fire are further representative of the "embedded culture of secrecy surrounding the hundreds of chemical plans and refineries that dominate Cancer Alley." *Id.* ¶ 20. In fact, since Plaintiffs filed their Original Petition, significant new evidence has come to light that was previously concealed by Marathon and could not have been reasonably known by Plaintiffs. *See id.* ¶¶ 44, 51–54, 60.

Numerous records disclosed to the public for the first time by investigative journalists and EPA in September 2024 revealed new details about the scale of the Refinery Fire's impacts and the lengths Marathon undertook to downplay those impacts. *Id.* For example, even while police officers were frantically attempting to enforce the Mandatory Evacuation Zone, local officials were reporting to the public that they were being assured by Marathon that all of the impacts were restricted to the Marathon site and that the evacuation was merely a precautionary measure. *Id.* ¶ 23. Indeed, at the end of the first day, state officials relayed Marathon's message to the State's office of homeland security: "All clear." *Id.* ¶ 24. In reality, Marathon and private firefighters continued to battle flare-ups for two more days. *Id.* ¶ 27. In fact, residents in the areas surrounding the Garyville Refinery were repeatedly and expressly told that there was "nothing to worry about"

both during and after the Refinery Fire, based at least in part on data from Marathon's own air monitoring. *Id.* ¶¶ 51–52. Other parties were also monitoring air quality, including LDEQ and a third-party group, CTEH, and recorded unhealthy levels of PM2.5 throughout the incident, including at levels considered hazardous by the EPA. *Id.* ¶ 58. Meanwhile, Plaintiffs learned for the first time in September 2024 that Marathon attempted to downplay PM2.5 emissions to the public and local officials by attributing the high readings to wildfires. *Id.* ¶ 59. However, according to research scientists, "even subtracting PM2.5 readings attributable to wildfires … the levels of [PM2.5] would still be hazardous." *Id.*

Moreover, Marathon took affirmative steps to limit the community's access to information and resources during and in the aftermath of the Refinery Fire. *Id.* ¶¶ 60–62. For example, during the Refinery Fire, Marathan established a call center purportedly to provide information to residents in the surrounding communities and to address their concerns; however, behind the scenes, the Refinery's human resources manager emailed Parish officials "requesting they not share information about the call center too widely." *Id.* ¶ 61. Similarly, on November 9, 2023, Marathon hosted a community meeting wherein the Refinery's safety and security manager assured the community that there was nothing to fear, announcing that, "despite the fact that we had a very unfortunate incident, the overall impact from the short-term or long-term to you guys … there was no impact." *Id.* ¶ 62.

Marathon has also limited the public's access to information by repeatedly failing to issue adequate emergency notifications and follow-up notices as required by federal and state regulations. *Id.* ¶¶ 95–101. On December 20, 2023, nearly four months after the Refinery Fire and Plaintiffs' Original Petition, Marathon finally reported to LDEQ that it had released approximately six million pounds of naphtha during the Refinery Fire, resulting in emissions of the carcinogen

benzene at an amount 143 times over the State's daily limit. *Id.* ¶ 63. Meanwhile, Marathon's reports remain deficient; for example, Marathon claims that no chemicals escaped from the second storage tank while visual evidence published by investigative journalists on September 9, 2024, and included in Plaintiffs' Amended Complaint, clearly shows that both of the storage tanks that had ignited were partly melted, engulfed in flames, and emitting thick black plumes into the air. *Id.* ¶ 64. Marathon has similarly omitted or only vaguely described the release from the third storage tank, which reportedly leaked an additional 2.3 million pounds of something Marathon has identified only in filings with EPA (not in its reports to LDEQ), and merely characterized as a "flammable mixture." *Id.* ¶ 65. Indeed, Plaintiffs' Amended Complaint alleges that Marathon's failure to issue adequate emergency notifications and follow-up notices rise to the degree of non-compliance with several federal and state statutes, thus constituting a breach of Marathon's duty to the community under Louisiana Civil Code article 2315. *Id.* ¶¶ 95–101.

Based on this new evidence that was not reasonably available to the public until September 2024, Plaintiffs filed an Amended Class Action Complaint asserting the same causes of action arising out of the same operative facts from Plaintiffs' Original Petition, only on behalf of a technically amended class definition. *See id.* ¶ 54.

## LAW AND ARGUMENT

### I. Standard of Review for Marathon's 12(b)(6) Arguments

A Rule 12(b)(6) motion to dismiss is "viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982). The purpose of a motion to dismiss is to test the sufficiency of a petition against Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not contain "detailed factual

allegations" but must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 570 (2007). The Court liberally construes the complaint in favor of the plaintiff. *Kaiser Aluminum & Chem. Sales, Inc.*, 677 F.2d at 1050. The Court's review of Marathon's motion is limited to the allegations of the complaint, which the Court accepts as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II. Prescription Did Not Run on the Plaintiffs' Actions in the Amended Complaint Due to *Contra Non Valentem*

Plaintiffs' claims are subject to a one-year liberative prescription period under Louisiana law, which runs from the day of injury or that damage was sustained, unless prescription has been interrupted or suspended. LA. CIV. CODE art. 3492. The doctrine of *contra non valentum* is one such mechanism through which prescription is suspended. *Jones v. Evonik Corp.*, 620 F. Supp. 3d 508, 516 (E.D. La. 2022). "Pursuant to the doctrine of *contra non valentem*, prescription does not run against a claimant who is ignorant of the existence of facts that would enable him to bring a cause of action, provided that his ignorance is not willful, negligent, or unreasonable." *Lennie v. Exxon Mobil Corp.*, 17-204 (La. App. 5 Cir. 6/27/18), 251 So. 3d 637, 642. Instead, prescription begins to run once the plaintiff has "actual or constructive knowledge of the facts indicating to a reasonable person that he or she is the victim of a tort." *Guerin v. Travelers Indem. Co.*, 2019-0861 (La. App. 1 Cir. 2/21/20), 296 So. 3d 625, 629 (citing *Campo v. Correa*, 2001-2707 (La. 6/21/02), 828 So. 2d 502, 510). *Contra non valentem* applies in four general situations:

> (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
>
> (2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
>
> (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action;

> (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.

*Whitnell v. Menville*, 540 So. 2d 304, 308 (La. 1989).

To survive a 12(b)(6) motion to dismiss, a plaintiff need not "incant the phrase '*contra non valentem*'" in her complaint, but must simply "plead some facts that make the application of the doctrine plausible." *Dalrymple v. U.S. Postal Serv.*, Civ. A. No. 18-14237, 2020 WL 1181845, at *6 (E.D. La. Mar. 12, 2020). Here, the facts in Plaintiffs' Amended Complaint plainly support at least the plausible applicability of the third and fourth categories of *contra non valentem*.

### A. Marathon's Conduct Prevented Plaintiffs from Availing Themselves of Their Causes of Action

The third category of *contra non valentem* "applies when the defendant has done some act effectually to lull the victim into inaction and prevent him from availing himself of his cause of action." *Lennie*, 251 So. 3d at 643. "To trigger application of the third category, a defendant's conduct that keeps the victim in ignorance must rise to the level of concealment, misrepresentation, fraud, or ill practices." *Dominion Expl. & Prod., Inc. v. Waters*, 2007-0386 (La. App. 4 Cir. 11/14/07), 972 So. 2d 350, 358. Plaintiffs pleaded numerous facts to support the characterization of Marathon's conduct as concealment, misrepresentation, and ill practices to keep the surrounding communities ignorant of the full scope and severity of the Refinery Fire and chemical release. R. Doc. 39, at ¶ 51. As explained in Plaintiffs' Amended Complaint:

> Plaintiffs only recently learned that the Marathon "shrouded in secrecy" the August 25, 2023, chemical release and fire at the Refinery, as investigative journalists uncovered and reported to the public for the first time on September 9, 2024, the affirmative steps that Marathon took to "minimiz[e] the episode in its reporting to both federal and state governments," who along with Marathon maintained throughout the four-day release and thereafter that "no offsite impacts" were ever detected, "citing company, state and third-party air monitoring." *Id.*

Courts have held that the third category of *contra non valentem* applies where a defendant misrepresents or conceals the risk that plaintiffs were exposed to harmful substances. For example,

in *Lester v. Exxon Mobil Corp.*, 10-743 (La. App. 5 Cir. 5/31/12), 102 So. 3d 148, the Louisiana Fifth Circuit Court of Appeal affirmed "that the third category of *contra non valentem* applied to the delictual claims for injuries caused by [naturally occurring radioactive material ("NORM")] exposure among oilfield workers because the defendant, Exxon Mobil, showed videos to its workers which stated that it would be very unlikely for an oilfield worker to inhale or ingest a harmful amount of NORM." *Lennie*, 251 So. 3d at 644 (distinguishing *Lester*).

Courts have also applied *contra non valentem* where a defendant assured the plaintiff that the harm was being addressed, thereby concealing the nature and extent of the damages. For example, in *Carter v. Haygood*, prescription of a plaintiff's claims against her dentist for medical malpractice was interrupted as long as the treating physician assured the patient he would "get it right" and "remedy her problems," and did not begin to run until it "became apparent" that the physician actually had no intention of treating the patient. 2004-64 (La. 1/19/05), 892 So. 2d 1261, 1273; *see also Bewley Furniture Co. v. Md. Cas. Co.*, 271 So. 2d 346 (La. App. 2 Cir. 1972) (finding the third category applicable because the plaintiff had been "assured by defendants the roof was sound and serviceable and the leaks could and would be stopped," reasoning that "prescription does not begin to run until all repair attempts have ceased and the nature and extent of the damage is known by the plaintiff").

As in *Lester*, where Exxon Mobil showed videos downplaying the possibilities of harmful exposure to its workers, Marathon continues to guard information regarding the full range of substances to which Plaintiffs were exposed, and attempted to downplay the increased levels of PM2.5 emissions by attributing the high readings to wildfires. R. Doc. 39, at ¶¶ 59, 65. Further, members of the community surrounding the Garyville Refinery—and particularly those outside of the Mandatory Evacuation Zone—were lulled into inaction by the Marathon's express assurances

that they had not been put in harm's way. Indeed, Plaintiffs were repeatedly and expressly told by Marathon and government officials there was "nothing to worry about" during the Refinery Fire and that there were "no offsite impacts." R. Doc. 39, at ¶¶ 51–52. At a community meeting hosted by Marathon, the Refinery's safety and security manager informed concerned citizens that "the overall impact from the short-term or long-term to you guys … was no impact." *Id.* ¶ 62.

However, modeling made available to the public for the first time in September 2024 illustrated that not only did the chemical plume reach far beyond the Garyville Refinery's fence line, but far beyond the perimeter of the two-mile evacuation zone. *Id.* ¶¶ 54–55. Of course, by the time the inadequate evacuation radius was announced, authorities had already ceded partial control to Marathon. *Id.* ¶ 22. As revealed by investigative journalists in September 2024 and pleaded in Plaintiffs' Amended Complaint, at all pertinent times, it was Marathon who had all the expertise and information about what was unfolding. *Id.* Marathon failed and continues to fail to sufficiently disclose this information, thus triggering the third category of *contra non valentem.*

### B. Plaintiffs Could Not Have Reasonably Known About Their Causes of Action

The fourth category applies when a "plaintiff's ignorance of his cause of action cannot be attributable to his own willfulness or neglect, as a plaintiff is deemed to know what he could have learned by reasonable diligence." *Morgan v. Entergy New Orleans, Inc.*, 2016-1250 (La. App. 4 Cir. 12/6/17), 234 So. 3d 113, 117 (quoting *Ferrara v. Starmed Staffing, LP*, 2010-0589 (La. App. 4 Cir. 10/6/10), 50 So. 3d 861, 866). The fourth category of the *contra non valentem* inquiry depends on "the reasonableness of a plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." *Jones*, 620 F. Supp. 3d at 517 (quoting *Lennie*, 251 So. 3d at 645). Here, Plaintiffs adequately pleaded facts to support that, regardless of Marathon's role or motivation in shielding information and downplaying the impacts of the

Refinery Fire, the delay in joining Plaintiffs outside of the Mandatory Evacuation Zone was reasonable in light of Plaintiffs' access to information and the nature of Marathon's conduct.

**i. Plaintiffs Reasonably Relied on Information Provided by Marathon**

Courts have found plaintiffs' ignorance of their claims reasonable where relevant information is controlled by the defendant. For example, in *Morgan v. Entergy New Orleans, Inc.*, prescription of a plaintiff's claims for personal injuries sustained when he tripped and fell over an unguarded guy wire attached to a utility pole was suspended where the identity of the wire's owner was not reasonably discoverable within the prescriptive period despite the plaintiff's diligent efforts. 234 So. 3d at 113. There, the plaintiff argued that he could not have reasonably identified the owner because:

> (1) Entergy, which owned the pole, incorrectly named BellSouth as the party responsible for the wire, and did not correct its error until after prescription ran; (2) the owner of the wire was not "reasonably knowable," given that Entergy, which had contracted with Cox for the attachment of Cox's wires to Entergy's poles, could not identify Cox as the owner of the wire; (3) Mr. Morgan reasonably relied on the accuracy of Entergy's information; (4) aside from Entergy's records, there are no public records that would have otherwise disclosed the owner of the wire.

*Id.* at 119. In other words, *contra non valentem* suspended the prescriptive period in *Morgan* because the plaintiff therein reasonably relied on information provided to him, particularly because the relevant facts were contained within the defendant's records and were not publicly available. *Id.*

Information about the scale and impacts of the Refinery Fire is and has been within Marathon's control. R. Doc. 39, at ¶ 22. Thus, it is reasonable for community members to rely on information provided to them by Marathon. For example, Plaintiffs reasonably relied on Marathon's representations that the establishment of the Mandatory Evacuation Zone was merely a "precautionary measure," such that community members in the Area of Impact outside of that radius believed they did not have a cause of action. *Id.* ¶ 23. Marathon has continued to supply

information that is solely within its control in the time since the Refinery Fire; however, Plaintiffs pleaded that this information has so far been inaccurate and incomplete. *See id.* ¶¶ 63–65, 95–101. As just one example, Marathon's reports to LDEQ completely omitted information about the third storage tank and its filings to EPA fail to identify the substance which caught on fire, identifying it only as a "flammable mixture." *Id.* ¶ 65. In other words, details about the fire and chemical release remain shrouded in secrecy and were not reasonably knowable to Plaintiffs.

**ii. Reasonable Inquiry Would Not Have Revealed Sufficient Information to Constitute Constructive Knowledge**

This Court has further held that physical symptoms do not necessarily constitute constructive knowledge sufficient to defeat *contra non valentem*. Specifically, in *Jones v. Evonik Corp.*, this Court recently explained that a medical diagnosis of a latent disease does not always constitute constructive notice of a tortious act. 620 F. Supp. 3d at 518. Instead, "even if plaintiff's diagnosis triggered a duty to inquire further, the Court can only deem plaintiff to know what a reasonable inquiry would have revealed." *Id.* For example, in *Jones*, the plaintiff was diagnosed with breast cancer in 2016, but did not have constructive knowledge of her claim, including that the nearby facility omitted harmful levels of the hazardous carcinogen, ethylene oxide, until 2020. *Id.* at 518–19.

In this case, Amended Class Reps experienced direct impacts that, based on information revealed in September 2024, they now attribute to effects from the Refinery Fire. For example, Plaintiff Melinda James worked within the Area of Impact but outside of the Mandatory Evacuation Zone. R. Doc. 39, at ¶ 33. On August 25, she drove through Garyville and smelled chemicals in the area. *Id.* That same day, she went to the hospital in LaPlace and was transferred by ambulance to an Ochsner facility in Kenner, where she received in-patient treatment for nearly

one week. *Id.* Plaintiff Wayne James likewise spent several days at an Ochsner facility receiving treatment. *Id.* ¶ 34.

However, based on information that was publicly available prior to September 2024, a reasonable and diligent inquiry would not have informed Amended Class Reps that their physical symptoms might give rise to claims based on the Refinery Fire. For example, prior to September 2024, an inquiry into whether the Refinery Fire affected areas beyond the two-mile radius would have revealed information from Marathon that there were "no offsite impacts" and that the Mandatory Evacuation Zone was merely a "precautionary measure." *Id.* ¶¶ 51–52, 62. Moreover, Marathon has still failed to fully disclose what substances Plaintiffs were exposed to. *Id.* ¶ 65. Accordingly, Plaintiffs' inquiry into whether their physical symptoms may align with releases from the Refinery Fire could not "lead to the true condition of things," as required by law to constitute constructive knowledge. *Jones*, 620 F. Supp. 3d at 518 (quoting *Lennie*, 251 So. 3d at 645).

**iii. Plaintiffs Acted Reasonably as Laypersons and Cannot Be Held to the Same Standard as Professional Mechanical Engineers**

On September 9, 2024, 3D simulations of the Refinery Fire (the "Model") were made publicly available for the first time by investigative journalists and finally illustrated that the chemical plume not only reached far beyond the Garyville Refinery's fence line, but beyond the perimeter of the Mandatory Evacuation Zone. R. Doc. 39, at ¶¶ 54–56. The Model, created by mechanical engineering experts and based on fluid dynamics, meteorological data, and images of the fire and the plume, show that the plume's growth and movement extended beyond the Mandatory Evacuation Zone. *Id.* The model provides a scientifically credible way to objectively define the class of plaintiffs impacted by emissions from the Refinery Fire and is the basis for the geographic boundaries of the class definition in Plaintiffs' Amended Complaint. *Id.* ¶¶ 54–56, 68.

Plaintiffs did not have constructive knowledge that impacts of the Refinery Fire extended beyond the Mandatory Evacuation Zone until the Model was made publicly available in September 2024. The average plaintiff cannot be expected to employ fluid dynamics and meteorological data at the level of professional mechanical engineering experts as required to determine that she has a cause of action. A court's *contra non valentem* inquiry must consider a plaintiff's "education, intelligence, and the nature of the defendant's conduct." *Jones*, 620 F. Supp. 3d at 517 (quoting *Lennie*, 251 So. 3d at 645). According to this standard, the timing of Plaintiffs' action is undoubtedly reasonable.

For these reasons, Plaintiffs have sufficiently pleaded the plausible application of *contra non valentem* such that prescription did not begin to run on Plaintiffs' claims until at least September 2024, their Amended Class Action Complaint filed in November 2024 was timely, and Marathon's motion to dismiss should be denied.

**III. Plaintiffs' Amended Complaint Relates Back to Their Original Petition**

Assuming *arguendo* that prescription was not suspended by Marathon's calculated efforts to downplay and conceal the severity and scope of the Refinery Fire or the Plaintiffs' reliance on information provided by Marathon and government officials in filing suit in August 2023, Plaintiffs' Amended Complaint is nonetheless timely because it relates back to the Original Petition. In the Fifth Circuit, "whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading, the amendment will relate back to the date of the original pleading." *Williams v. United States*, 405 F.2d 234, 236 (5th Cir. 1968). Marathon does not dispute that the claims in Plaintiffs' Original Petition and Amended Complaint arise out of the same conduct or occurrence.

Instead, Marathon contends that Plaintiffs have not satisfied additional standards under Rule 15(c) that are implicated because the putative class of the Amended Complaint encompasses a larger geographic area than that of the Original Petition. Specifically, Marathon argues that (1) it did not receive fair notice of Plaintiffs' claims such that it will be prejudiced in defending on the merits, and (2) that it did not know or should not know have known that Plaintiffs were effectively bringing an action against it but for a mistake concerning identity.[4] Although not expressly covered by Rule 15(c), the Fifth Circuit has applied the criteria therein to amendments adding or substituting plaintiffs. *See SMS Fin., Ltd. Liability Co. v. ABCO Homes, Inc.*, 167 F.3d 235, 244–45 (5th Cir. 1999).

### A. Plaintiffs' Original Petition Provided Fair Notice to Marathon of the Claims and Parties in Plaintiffs' Amended Complaint

"Clearly notice is the critical element involved in Rule 15(c) determinations." *Williams*, 405 F.2d at 236; *see also Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974). In Marathon's cited case, *Williams v. United States*, the Fifth Circuit explained that this inquiry requires a case-by-case analysis:

> The general rule … is that the rule of relation back does not extend to amendments that add new parties or causes of action. But stating the general rule is not too helpful here, for it simply states a conclusion. Each case must be tested by the 'conduct, transaction, or occurrence' standard to determine whether adequate notice has been given.

405 F.2d at 237 (citing *Snoqualmie Tribe of Indians ex rel. Skykomish Tribe of Indians v. United States*, 372 F.2d 951, 961 (Ct. Cl. 1967)). As Marathon notes, the *Williams* Court held that for notice to be effective, "[n]ot only must the adversary have had notice about the operational facts, but it must have had fair notice that a legal claim existed in and was in effect being asserted by, the party belatedly brought in." *Williams*, 405 F.2d at 238. In *Williams*, even though the plaintiff-

---

[4] R. Doc. 43-1 at 6–7.

mother originally only brought claims as next friend to her minor son, the court found that an amended complaint asserting a claim in her own right related back because the defendant had notice of the mother's claim. *Id.* at 239. Put differently, the court explained that the defendant was on notice of the operative set of facts and the potential for those facts to give rise to the liability of the mother in her individual capacity such that the original complaint provided notice that the mother's claim was involved. *Id.*

The same rationale applies here. Through Plaintiffs' Original Petition, Marathon was put on notice of the operative set of facts and of its obligation to defend against claims for impacts of the Refinery Fire and chemical release by the surrounding communities exposed to emissions, not merely for the impacts of the mandatory evacuation. *See, e.g.*, *Duhe*, R. Doc. 1-1, at ¶¶ 17, 18. At the time that Plaintiffs filed their Original Petition, Plaintiffs relied on information provided by Marathon and government authorities in defining the boundary of both claims as the perimeter of the evacuation zone, erroneously believing that this boundary encompassed the geographic extent of emissions from the Refinery Fire. This was a mistake, as Plaintiffs subsequently learned in September 2024 that the impacts of the chemical release and fire extended beyond the Mandatory Evacuation Zone. Thus, Plaintiffs' Amended Complaint serves as a correction to its previous class definition rather than an expansion. Accordingly, the claims brought through Plaintiffs' Amended Complaint are "sufficiently closely related to warrant the conclusion that [Marathon] received adequate notice of the possibility that it might have to defend against a broader claim." *Williams*, 405 F.2d at 238 (quoting *Snoqualmie Tribe of Indians*, 372 F.2d at 961).

### B. Marathon Is Not Prejudiced by Plaintiffs' Amended Complaint

The *Williams* Court further explained that because the defendant had fair notice of the mother's claims, it likewise suffered no prejudice. 405 F.2d at 239. While the Court acknowledged

that the defendant "must now defend a claim which—from the mere passage of time—it might have thought was barred, … neither limitations nor laches affords such an automatic insulation in so mechanical a way." *Id.* Likewise, because Marathon had fair notice of the operative facts and its obligations to defend against the claims raised in Plaintiffs' Amended Complaint, it cannot be said to suffer any prejudice.

Additionally, Plaintiffs' Amended Complaint would not unduly prejudice Marathon as the parties have not initiated discovery, the proposed class from the Original Petition has yet to be certified, and Marathon still has the opportunity to challenge Plaintiffs' proposed class at the forthcoming hearing. "Generally courts do not find undue prejudice when there is an adequate opportunity to address the amended complaint and complete discovery when needed." *M.D. v. Perry*, 294 F.R.D. 7, 65 (S.D. Tex. 2013). For example, in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, the U.S. District Court for the Northern District of California held that a proposed modification to a class definition would not cause undue prejudice or delay, reasoning that the amendment would not require additional discovery. 267 F.R.D. 583, 591 (N.D. Cal. 2010). And in *Abraham v. WPX Energy Production, LLC*, the U.S. District Court for the District of New Mexico held that the defendants would not suffer undue prejudice from an amended class definition, even where the parties had been litigating under the original class definition for more than four years. 322 F.R.D. 592, 640 (D.N.M. 2017). Because Marathon has not propounded discovery and Plaintiffs' original class definition had yet to be certified, Marathon will not be prejudiced in defending on the merits of the claims in Plaintiffs' Amended Complaint.

### C. The Plaintiff in *Cliff* Was Never Prevented from Bringing Claims on Behalf of a Geographically Larger Class as Plaintiffs Were Here

Marathon's motion relies heavily on the Eleventh Circuit's decision in *Cliff v. Payco General American Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004), arguing that it "answered the

exact question presented here."[5] In *Cliff*, the Eleventh Circuit held that an amended class action complaint that brought claims on behalf of both Florida-based and nationwide consumers did not relate back to the original pleading that was expressly limited to Florida residents. *Id.* at 1132–33. However, the facts in *Cliff* are clearly distinguishable from the instant matter. There, as the Eleventh Circuit aptly noted, "Nothing prevented Cliff from seeking to represent consumers outside Florida from the moment he initiated this lawsuit." *Id.* at 1132. In contrast, Plaintiffs here were prevented from bringing suit and seeking to represent residents and businesses outside the Mandatory Evacuation Zone because they were made to believe it was a comprehensive area of impact. Moreover, the plaintiff in *Cliff* was not led to believe that the boundary of Florida in fact encompassed the entirety of the United States. Here, Plaintiffs' original class definition was intended to encompass the entirety of the geographic area impacted by emissions from the Refinery Fire, which was mistakenly underestimated due to reliance on the limited information Marathon made available to the public.

Additionally, it is essential to bear in mind the relative scale between what the *Cliff* plaintiff proposed and what Plaintiffs' Amended Complaint achieves. Specifically, the class definition in Plaintiffs' Amended Complaint would increase the encompassed area from two miles around the Garyville Refinery to, at its absolute furthest point, less than eight miles from the Refinery. *See* R. Doc. 39, at ¶ 55. These bounds barely extend beyond the borders of St. John the Baptist Parish. *Id.* This slight change cannot possibly be viewed in the same light as an amendment that sought to expand a class definition from covering just Florida to encompassing *the entire country*. *See Cliff*, 363 F.3d at 1119. Accordingly, to say that Marathon's assertion that the *Cliff* court "answered the exact question presented here" is misleading is an understatement.

---

[5] R. Doc. 43-1, at 7.

For these reasons, Marathon received fair notice; is not prejudiced; and knew or should have known that Plaintiffs would have brought, and were effectively bringing, an action on behalf of the amended class in their Original Petition but for a mistake in the proper geographic boundary necessary to capture the extent of exposure to emissions from the Refinery Fire. Therefore, Plaintiffs' Amended Complaint relates back to their Original Petition and all claims therein were timely filed.

## IV. The Balance of Equities Weigh in Plaintiffs' Favor

Marathon first and foremost presents its Motion to Dismiss as a plea for "essential fairness."[6] However, Marathon's invocation of *American Pipe & Construction Co.* is a red herring and the balance of equities in this case plainly weighs in Plaintiffs' favor. As an initial matter, *American Pipe* does not stand for the proposition Marathon thinks it does. Indeed, the *American Pipe* Court explained that, in the interest of fairness, a defendant is entitled to know "[w]ithin the period set by the statute of limitations, … both the subject matter and size of the prospective litigation[.]" 414 U.S. at 555. For all the reasons discussed herein, Marathon is the party in this equation who has known that essential information, and it is Plaintiffs who were precluded from accessing this information within the prescriptive period.

In contrast, federal courts routinely find that it is unfair to potential plaintiffs to deny class certification where the difficulty in identifying class members is mostly due to the conduct of the defendant. *See, e.g.*, *Ms. L. v. U.S. Immigration and Customs Enforcement ("ICE")*, 330 F.R.D. 284 (S.D. Cal. 2019); *Agne v. Papa John's Intern., Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012). For example, in *CE Design v. Beaty Const., Inc.*, the U.S. District Court for the Northern District of Illinois explained that even where there was "no evidence that the list of [potential plaintiffs] was

---

[6] R. Doc. 43-1, at 1.

destroyed with a nefarious purpose … a defendant can not escape liability simply by destroying the list of its victims." No. 07 C 3340, 2009 WL 192481, at *3 (N.D. Ill. Jan. 26, 2009) (citing *Appleton Elec. Co. v. Advance-United Expressways*, 494 F.2d 126, 139 (7th Cir. 1974)). Similarly, defendants should not be encouraged to launch inadequate emergency responses and file inaccurate and incomplete incident reports until prescriptive periods have tolled in order to avoid liability from a larger class.

The hypocrisy of Marathon wielding *American Pipe* to argue that it was not given fair notice by a community from which it affirmatively concealed information, and to which it repeatedly assured there was nothing to worry about, while simultaneously dousing their homes and businesses in carcinogens, is not lost on Plaintiffs and should not be lost on this Court. Thus, despite Marathon's contentions, dismissing the claims in Plaintiffs' Amended Complaint would be in contravention of every legislative and jurisprudential standard of fairness.

## CONCLUSION

For the reasons herein, Plaintiffs respectfully pray that this Court deny Marathon's Motion to Dismiss Plaintiffs' Amended Class Action Complaint in its entirety.

**[Signature blocks on the next page]**

Respectfully submitted,

*/s/ Kerry J. Miller*

Kerry J. Miller, La. Bar No. 24562
Paul C. Thibodeaux, La. Bar No. 29446
Daniel J. Dysart, La. Bar No. 33812
C. Hogan Paschal, La. Bar No. 38495
Julie S. Meaders, La. Bar No. 39984
Isabel A. Englehart, La. Bar No. 40354
Brennan F. O'Keefe, La. Bar No. 40474
**FISHMAN HAYGOOD, LLP**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170
T: (504) 586-5252
F: (504) 586-5250
kmiller@fishmanhaygood.com
pthibodeaux@fishmanhaygood.com
ddysart@fishmanhaygood.com
hpaschal@fishmanhaygood.com
jmeaders@fishmanhaygood.com
ienglehart@fishmanhaygood.com
bokeefe@fishmanhaygood.com

Hugh Lambert, La. Bar No. 7933
Brian Mersman, La. Bar No. 38624
**LAMBERT ZAINEY SMITH & SOSO, APLC**
701 Magazine Street
New Orleans, LA 70130
T: (504) 581-1750
F: (504) 529-2931
hlambert@lambertzainey.com
bmersman@lambertzainey.com

Cayce C. Peterson, La. Bar No. 32217
Joseph B. Marino, III, La. Bar No. 29966
Jeffrey P. Green, La. Bar No. 30531
**JJC LAW LLC**
111 Veterans Memorial Blvd.
Heritage Plaza, Suite 810
Metairie, LA 70005
T: 504-513-8820
F: 504-513-8824
cayce@jjclaw.com
josh@jjclaw.com
jeff@jjclaw.com

Sylvia Elaine Taylor, La. Bar No. 08425
Alicia McDowell, La. Bar No. 36905
**TAYLOR & MCDOWELL LAW**
1935 W. Airline Hwy
LaPlace, LA 70068
T: (985) 359-9100
F: (985) 359-9109
syvlia@taymclaw.com
alicia@taymclaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed on this 14th day of January, 2025 via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

*/s/ Kerry J. Miller*
**KERRY J. MILLER**